Case No. _____

# In the United States Court of Appeals for the Fifth Circuit

DAVID SAMBRANO and GENISE KINCANNON,
on their own behalf and on behalf of all others similarly situated,

*Plaintiffs-Petitioners,*

v.

UNITED AIRLINES, INCORPORATED,

*Defendant-Respondent.*

On Petition for Permission to Appeal from the
United States District Court for the Northern District of Texas
No. 4:21-cv-01074-P, Hon. Mark Pittman

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

John C. Sullivan
S|L Law PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Gene C. Schaerr
 *Counsel of Record*
Mark R. Paoletta
Brian J. Field
Cristina Martinez Squiers
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
gschaerr@schaerr-jaffe.com

*Counsel for Plaintiffs-Petitioners*

July 5, 2024

# CERTIFICATE OF INTERESTED PERSONS

No. _____

DAVID SAMBRANO AND GENISE KINCANNON, ON THEIR OWN BEHALF
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

v.

UNITED AIRLINES, INCORPORATED

The undersigned counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| | |
|---|---|
| Plaintiffs-Petitioners: | David Sambrano and Genise Kincannon |
| Current and Former Counsel for Plaintiffs-Petitioners: | SCHAERR \| JAFFE LLP<br>Gene C. Schaerr (gschaerr@schaerr-jaffe.com)<br>Mark R. Paoletta (mpaoletta@schaerr-jaffe.com)<br>Brian J. Field (bfield@schaerr-jaffe.com)<br>Cristina Martinez Squiers (csquiers@schaerr-jaffe.com)<br><br>S \| L LAW PLLC<br>John C. Sullivan (john.sullivan@the-sl-lawfirm.com)<br>David Austin R. Nimocks<br>  (austin.nimocks@the-sl-lawfirm.com) |

Defendant-
Respondent:     United Airlines, Incorporated

Counsel for
Defendant-
Respondent:     JONES DAY
Donald J. Munro (dmunro@jonesday.com)
Alexander V. Maugeri (amaugeri@jonesday.com)
Hashim M. Mooppan (hmmooppan@jonesday.com)
Jordan M. Matthews (jmatthews@jonesday.com)
Jonathan M. Linas (jlinas@jonesday.com)
Patrick J. Beisell (pbeisell@jonesday.com)

KELLY HART & HALLMAN LLP
Russell D. Cawyer (russell.cawyer@kellyhart.com)
Taylor J. Winn (taylor.winn@kellyhart.com)

SEYFARTH SHAW, L.L.P.
Esteban Shardonofsky (sshardonofsky@seyfarth.com)
Vanessa Nicole Rogers (vrogers@seyfarth.com)

Other
interested
entity:     Airline Employees 4 Health Freedom

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for*
*Plaintiffs-Petitioners*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF AUTHORITIES....................................................iv

INTRODUCTION.............................................................1

QUESTIONS PRESENTED ....................................................3

STATEMENT .................................................................4

    A.    Factual background .....................................................4

    B.    Procedural background................................................8

REASONS FOR GRANTING THE PETITION....................................10

    I.    The District Court Erred In Denying Certification of the Rule 23(b)(2) Class...............................................11

    II.    The District Court Erred In Denying Certification of the Rule 23(b)(3) Masking-and-Testing Subclass. ........................19

    III.    The ADA Plaintiffs Should Be Included In the Class...............21

CONCLUSION ..............................................................25

CERTIFICATE OF COMPLIANCE.....................................27

CERTIFICATE OF SERVICE................................................28

PETITION APPENDIX......................................................29

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Abner v. Kansas City S. R.R. Co.*,
  513 F.3d 154 (5th Cir. 2008) ................................................................ 17

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) .................................................... 10, 17, 18

*BST Holdings LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ................................................................ 13

*Gene & Gene, L.L.C. v. BioPay, L.L.C.*,
  624 F.3d 698 (5th Cir. 2010) ............................................................... 10

*Hamilton v. Dallas County*,
  79 F.4th 494 (5th Cir. 2023) .......................................................... 10, 16

*Holmes v. Godinez*,
  311 F.R.D. 177 (N.D. Ill. 2015) .......................................................... 23

*McNeill v. Fresh Meats, Inc.*,
  No. 2:23-cv-041-Z, 2023 WL 8532408
  (N.D. Tex. Dec. 8, 2023) .............................................................. 15, 16

*Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*,
  482 F.3d 372 (5th Cir. 2007) ............................................................... 10

*Sambrano v. United Airlines, Inc.*,
  No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ........ 1, 6, 9, 13

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................... 10, 12, 14, 17

**Rule**

Fed. R. Civ. P. 23 ............................................2, 10, 11, 12, 14, 15, 16, 21

**Other Authority**

*Oversight of the U.S. Airline Industry Before the S. Comm. on Com., Sci., & Transp.*, 117th Cong. (2021) ....................................... 8

## INTRODUCTION

As this Court previously recognized, United Airlines developed and implemented a COVID-19 vaccine mandate that sought to coerce employees to abandon all religious and medical objections to receiving the vaccine. *See Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022), *reh'g denied,* 45 F.4th 877 (5th Cir. 2022). Since then, discovery confirmed United's deliberate and discriminatory plan, in its "accommodation" policy, to use the prospect of indefinite, unpaid leave as a cudgel to coerce compliance. In fact, even when United responded to this litigation by developing a separate masking-and-testing "accommodation" for non-customer-facing employees, United took pains to ensure that the "accommodation" was still punitive and coercive.

Given that record, Plaintiffs demonstrated that the district court should certify three classes: (1) A Rule 23(b)(2) class of all employees who sought a medical or religious "accommodation" and were informed they would be required to choose between their faith and health or their paycheck; (2) a Rule 23(b)(3) subclass of all employees who were subject to United's draconian masking-and-testing accommodation; and (3) a

Rule 23(b)(3) subclass of all employees who were ultimately placed on indefinite, unpaid leave. For each class, Plaintiffs demonstrated that the Court should include those employees with claims brought under Title VII of the Civil Rights Act of 1964 and under the Americans with Disabilities Act (ADA).

By refusing to certify either of the first two proposed classes, or *any* class with ADA claims, the district court overlooked substantial record evidence and binding decisions from this Court and the Supreme Court. The Court should thus grant leave to appeal in order to remedy those errors.[1]

---

[1] Plaintiffs and United have conferred about this petition. United does not oppose Plaintiffs' petition, and Plaintiffs do not oppose the cross-petition that United is contemporaneously filing. While each side disagrees with the other on the respective merits, the parties agree that the district court's class-certification rulings warrant this Court's review under Rule 23(f).

## QUESTIONS PRESENTED

1.  Did the district court err in holding that, despite United's uniform and coercive policy to put onto unpaid leave all employees who requested an accommodation from United's COVID-19 vaccine mandate, Plaintiffs' proposed Rule 23(b)(2) class failed to meet the commonality and typicality requirements of Rule 23(a)?

2.  Did the district court err in holding that the punitive damages Plaintiffs sought for the Rule 23(b)(2) class were precluded by this Court's decision in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)?

3.  Did the district court err in denying certification of a Rule 23(b)(3) class for the large number of employees United subjected to a uniform and punitive masking-and-testing accommodation?

4.  Did the district court err in concluding that individualized issues of injury and disability prevented all employees with ADA claims from being part of any class, even though all such employees suffered from the same systemwide policy as the employees with Title VII claims?

## STATEMENT

### A.    Factual background

In January 2021, before any COVID-19 vaccine had been fully approved for use in the United States, United's CEO Scott Kirby announced that he wanted United to impose a COVID-19 vaccine mandate.  App.113-14.[2]  He did this without notifying United's executive team.  App.771-74.  Rather, this was part of Kirby's plan to boost United's standing in the markets and with White House officials.  App.114, 447.

Months later, the United HR official responsible for monitoring COVID-19 hospitalizations and deaths informed senior United leadership that he did not believe a COVID-19 vaccine mandate was necessary.  App.397.  United's head of HR agreed.  *Id.*  Ignoring this, Kirby decided just days later that United would nonetheless impose a COVID-19 vaccine mandate.  App.56, 137.

This lawsuit does not challenge that mandate.  Rather, the lawsuit challenges what happened next, when United engaged in a pressure campaign to coerce United employees to comply with that mandate

---

[2] Citations to "App." refer to the 3-volume appendix filed in support of Plaintiffs' Renewed Motion for Class Certification (ECF Nos. 243, 243-1, 243-2).

despite their religious or medical objections.  As part of that campaign, United determined that it would provide only one accommodation for any requesting employee: indefinite, unpaid leave—potentially for several years.  App.286.  It did not matter the reason the employee requested the accommodation, nor did it matter what type of job the employee held. United told everyone they would be treated the same.  And Kirby threatened all employees to "be very careful" about requesting an accommodation, as doing so would be "putting [their] job on the line." ECF No. 7 at 11.

To keep up the pressure during this time, Kirby also proposed requiring unvaccinated employees to wear special stickers on their ID badges to broadcast their vaccination status.  App.96.  And United sent postcards to employees at their homes, where the postcard was written with intentionally conspicuous "red text" that would "stand out" to alert the employee's spouse of the risk that the employee may soon lose his or her paycheck.  App.436-38.  For United leadership, it wasn't enough to pressure employees in the workplace, they also wanted employees considering requesting an accommodation to be pressured at home. And United's actions had their desired effect, as bullying and harassment

became commonplace for accommodation seekers across United's workforce.  App.562-63, 632-37.

As this Court already recognized, United's pressure campaign put employees to a crisis of conscience: They could either follow their beliefs and health needs or they could put food on the table.  *Sambrano*, 2022 WL 486610, at *3.  But United would not allow them to do both.

Recognizing the unlawful nature of United's unpaid-leave policy, Plaintiffs filed a lawsuit under Title VII and the ADA.  ECF No. 1.  And they requested a preliminary injunction that would prevent United from placing employees on indefinite, unpaid leave as an "accommodation." ECF No. 5.  Shortly thereafter, and once it became clear that United would be subject to judicial scrutiny, United changed course slightly and decided that one subset of employees—those United deemed non-customer facing—would be permitted to work subject to a harsh masking-and-testing "accommodation."  App.78.

However, that "accommodation" was equally coercive, and like unpaid leave, it applied across the board to a broad swath of employees with wide-ranging roles and responsibilities.  Regarding masks, for instance, "accommodated" employees could not wear the cloth masks

worn by others—they had to wear N95/KN95 respirators *at all times* unless actively taking bites of food or drinking. App.165. That was true even while eating alone outside, which "accommodated" employees were required to do. *Id*. United even told "accommodated" employees to wear these respirators while on *personal* travel. App.165.

Kirby also made clear that this masking-and-testing "accommodation" was meant to be excessive, as he wanted the policy to "sound[] very serious to them. Masks at all times (including outdoors) and *automatic termination* for violating the policy." App.94 (emphasis added). Similarly, United later proposed "remov[ing] discipline from everyone *who has been vaccinated* but has a mask warning in the record." App.573 (emphasis added). But of course, United did not propose removing any mask-related discipline for "*accommodated*" employees— they were still subject to separate and more onerous rules. App.791-92.

At the same time, United forced all customer-facing employees with an accommodation to go on indefinite, unpaid leave. As United explained it, customer-facing employees (*i.e.*, those working in planes) posed too much of a risk while working unvaccinated—even if they regularly tested and wore masks. That rationale fell apart, however, when Kirby told

customers that United planes were some of the safest places one could be—even cleaner than an ICU.  App.581; *Oversight of the U.S. Airline Industry Before the S. Comm. on Com., Sci., & Transp.*, 117th Cong. (2021) (Dec. 15, 2021 video testimony of Scott Kirby, CEO, United Airlines, at 56:24), available at https://tinyurl.com/yeyneupe.  Plus, there was no mandate for passengers to be vaccinated.  ECF No. 239 at 6–7. Nor did United require its international employees, even those flying into and throughout the United States, to be vaccinated.  *Id.*

The record thus confirms that United's safety explanations were mere pretexts for discrimination.  And the record further demonstrates that United's accommodation policies were applied uniformly across thousands of employees.  Indeed, United admitted that it chose not to process accommodation requests individually because of "the volume of requests," which would have been "too onerous."  App.589.  Instead, United treated all accommodation requesters as a single class.

## B.    Procedural background

After the district court denied Plaintiffs' motion for a preliminary injunction, this Court reversed that decision and found that the district court erred in concluding that United employees were not facing

irreparable harm when forced to decide between violating their faith and forgoing their income. *Sambrano*, 2022 WL 486610.

On remand, the parties engaged in extensive class discovery. Thereafter, the district court correctly certified a class under Rule 23(b)(3) consisting of "all employees United deemed customer-facing who received an accommodation due to a sincerely held religious belief[] and who were put on unpaid leave." Appx.41. However, the district court excluded those with ADA claims from the certified class. Appx.35.

Despite the extensive evidence of coercion mentioned above and detailed in Plaintiffs' motion for class certification, the district court denied Plaintiffs' request for certification of two additional classes: (1) a Rule 23(b)(2) class of all individuals who submitted an accommodation request from United's COVID-19 vaccine mandate for religious or medical reasons and who were then forced to decide between abandoning their faith or medical needs and accepting indefinite, unpaid leave; and (2) a Rule 23(b)(3) subclass consisting of all employees United deemed non-customer facing who received an "accommodation" for religious or medical reasons and who were subject to an intentionally punitive masking-and-testing accommodation. Appx.27.

## REASONS FOR GRANTING THE PETITION

The district court's refusal to certify two additional classes—and to include the ADA claims in the class it did certify—raises significant and novel legal questions, which include the proper application of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), and this Court's decisions in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), and *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023).

Under Rule 23(f), "courts of appeals are given unfettered discretion" to grant leave to appeal an order on class certification. *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 703 (5th Cir. 2010) (quotation marks omitted). Further, "it is appropriate to grant leave to appeal" where a "certification decision turns on a novel or unsettled question of law." *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 379 (5th Cir. 2007) (quotation marks omitted for second quote).

The Court should grant the present petition for three reasons. First, the district court disregarded the common injury that holds the Rule 23(b)(2) class together—United's systemic and coercive scheme to deter employees from seeking accommodations, which culminated in

10

United's punishing *all* employees who did so with the "accommodation" of unpaid leave. This universal treatment is sufficient to satisfy commonality and typicality under Rule 23(b)(2). And, because all employees who applied for an accommodation were treated the same, punitive damages for United's coercive campaign can be calculated on a class-wide basis. Second, the district court erred when holding that masking and testing is not necessarily an unreasonable accommodation because the court ignored the abundant evidence Plaintiffs identified showing that United's universal masking-and-testing "accommodation" was unreasonable. Finally, the district court erred by excluding all employees with ADA claims from any class, as those Plaintiffs suffered from the same coercive scheme as the Title VII employees, and therefore no individual inquiries preclude their inclusion in the class.

## I.    The District Court Erred In Denying Certification of the Rule 23(b)(2) Class.

In denying certification of a Rule 23(b)(2) class, the district court made two fundamental errors that require this Court's review. First, as to that class, the district court looked to the incorrect injury when concluding that commonality and typicality were lacking. Second, the

court misapplied binding precedent when concluding that this class could not be awarded a uniform set of incidental damages.

1. As to injury, Plaintiffs demonstrated that United imposed the same injury on all employees who submitted an accommodation request by devising and implementing the coercive plan to put all such employees onto indefinite, unpaid leave. Because that policy was unlawful and harmful on its own, a Rule 23(b)(2) class is appropriate to enjoin United from again imposing unpaid leave as an accommodation. *See Dukes*, 564 U.S. at 343.

The district court, however, concluded that Plaintiffs had not demonstrated a common or typical injury experienced by the entire proposed Rule 23(b)(2) class. *See* Appx.8-15, 25-26. But that analysis addressed only strawmen—the downstream effects of the common injury. *See, e.g.*, *id*. at 8-15 (discussing various theories of injuries). The district court overlooked the single, class-wide injury that United caused— forcing employees to decide between their protected civil rights under Title VII and the ADA and forgoing their paychecks. And the record shows that United forced this unlawful choice on *all* accommodation requesters without regard to the reason the employee sought an

accommodation (medical or religious) and without regard to the employee's job duties.  ECF No. 239 at 15–16.

As this Court already explained, such coercion "is harmful in and of itself[.]"  *Sambrano*, 2022 WL 486610, at *3; *accord BST Holdings LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (describing the same harm from a coerced "choice between their job(s) and their jab(s)").  Indeed, this Court recognized that United forced Plaintiffs into "an impossible choice" between "remain[ing] faithful" and "put[ting] food on the table." *Sambrano*, 2022 WL 486610*, at *9.  And that coercion stemmed from the top, where Kirby openly threatened United employees who were considering requesting an accommodation.  *Id.*

The district court failed to engage fully with this Court's opinion or with the extensive discovery record developed after remand.  Instead, the district court offered only a passing footnote addressing Plaintiffs' demonstrated injury, *see* App.10 n.2, which itself failed to address, or even acknowledge, that United's policy was "a [Kirby]-level initiative" made "consciously knowing that [it] would upset some people," App.147, or that United devised its unpaid leave policy to exert maximum pressure on *all* employees throughout the entire accommodation process.

13

In fact, class discovery revealed that Kirby wanted United to be a leader in mandating vaccines through a uniform policy, so the accommodation process was purposefully set up to impose a "high bar" that only a few employees could pass.  ECF No. 239 at 5–10.  Kirby even publicly acknowledged that this uniform policy was meant to coerce behavior.  App.413-14 (discussing how the prospect of losing income would convince employees to acquiesce).  And those who withstood the intimidation and completed the accommodation process were rewarded with universal, indefinite leave.

This policy of unlawful coercion is the "glue holding together the alleged reasons for" United's refusal to provide reasonable accommodations.  *Dukes*, 564 U.S. at 352 (emphasis omitted).  Thus, resolving the single question of whether involuntary, unpaid leave is a reasonable accommodation would apply equally to all members of the proposed Rule 23(b)(2) class.[3]

---

[3] The district court's commonality analysis under Rule 23(b)(2) also incorrectly suggested that Plaintiffs proposed two common questions for this class: (1) the lawfulness of United's harsh masking-and-testing "accommodation;" and (2) the lawfulness of the unpaid-leave policy. Appx.8, 14.  But Plaintiffs identified the common question regarding the masking-and-testing policy for the *(b)(3)* class.  ECF No. 239 at 27.  That

Rather than considering this evidence and authority, the district court concluded that the Rule 23(b)(2) class "ha[d] different injuries," because "not all employees … were put on unpaid leave." Appx.8, 9. While true that United changed course after Plaintiffs filed this lawsuit, those downstream accommodation decisions are irrelevant because United had already subjected *all* "accommodated" employees to the same harmful policy by informing *all* of them that they would shortly lose their paychecks indefinitely—potentially for several years. It cannot be, as the district court concluded, that United may impose such a harmful choice yet escape liability simply by changing course after Plaintiffs filed their lawsuit.

Further, this Court's review is important because the district court's conclusion that Plaintiffs had not demonstrated commonality or typicality because "[t]he alleged adverse actions vary" across the proposed class, Appx.10, 25, contrasts with the recent decision of another court in this Circuit in a strikingly similar case. In *McNeill v. Fresh Meats, Inc.*, No. 2:23-cv-041-Z, 2023 WL 8532408 (N.D. Tex. Dec. 8, 2023),

---

question is irrelevant for the (b)(2) class members, who were all harmed at the outset by United's discriminatory unpaid-leave policy.

the court addressed a COVID-19 vaccine mandate where the employer offered only extended unpaid leave as an accommodation, and where the plaintiff filed a Title VII claim after the pressure of facing lost income caused him to abandon his beliefs and receive the COVID-19 vaccine. *Id.* at *1-2. Under those facts, where the plaintiff was *never placed on unpaid leave*, the district court applied this Court's precedent and concluded that the plaintiff sufficiently alleged an adverse action. *Id.* at *6-7. As the *McNeill* court explained, this Court's recent decision in *Hamilton*, 79 F.4th 494, "now guides" courts that facing a "'realistic, drastic pay cut threat' amounts to a 'materially adverse' employment action." *McNeill*, 2023 WL 8532408, at *6 (citing cases).

That is precisely what happened here: United developed a centralized policy to force all employees with religious or medical reasons for requesting an accommodation to face a "realistic, drastic pay cut threat." And, because such a policy was clearly unlawful, Plaintiffs sought a class-wide injunction prohibiting United from again imposing a vaccine mandate with the threat of indefinite, unpaid leave. ECF No. 256 at 19. This is the scenario the Supreme Court envisioned in *Dukes*: The key under Rule 23(b)(2) is "the indivisible nature of the injunctive or

declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." 564 U.S. at 360 (quotation marks omitted).

Ultimately, there is ample authority from this Court and the Supreme Court supporting certification of a Rule 23(b)(2) class for such a claim, and the district court erred by refusing to do so. Moreover, this presents a significant issue that has already caused courts within this Circuit to reach conflicting conclusions. Accordingly, this Court should grant Plaintiffs' leave to appeal.

2. As to damages, the district court also erred by concluding that the requested punitive damages are not "incidental" to the requested injunctive relief. Appx.27. Punitive damages are appropriate to provide "the deterrence that Congress intended in the most egregious discrimination cases[.]" *Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 163 (5th Cir. 2008); *accord Allison*, 151 F.3d at 411. This is such a case.

Here again, the district court misunderstood the record and binding precedent. To be sure, the district court correctly summarized much of this Court's decision in *Allison*, 151 F.3d 402. As the district court explained, *Allison* held that Rule 23(b)(2) "does not extend to cases in

which the appropriate final relief relates exclusively or predominantly to money damages." *Id.* at 411 (emphasis and quotation marks omitted). Rather, Rule 23(b)(2) classes require that "the predominant relief sought is injunctive or declaratory." *Id.* And monetary relief predominates if it is anything other than "incidental to [the] requested injunctive or declaratory relief." *Id.* at 415.

The district court, however, got sidetracked with the specific facts of *Allison*, overlooking how this case falls into the exception *Allison* identified. In *Allison*, this Court explained that: "Assuming punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts, no such discrimination is alleged *in this case*." 151 F.3d at 417 (emphasis added).

*Allison* thus assumed cases like this one exist, where an entire class was subject to a uniform discriminatory policy (like United's coercive unpaid leave plan) and where that conduct was sufficiently harmful to warrant class-wide punitive damages. Plaintiffs here sought a standardized, class-wide award of punitive damages because the entire class was subject to the same discriminatory act—United's imposing the

coercive choice between livelihoods and beliefs or health. The district court erred by failing to conclude (or even discuss) that this case presented the precise exception *Allison* assumed would exist.

## II.  The District Court Erred In Denying Certification of the Rule 23(b)(3) Masking-and-Testing Subclass.

Plaintiffs also showed that United devised and implemented a purposefully punitive masking-and-testing "accommodation" as part of its effort to punish and coerce those employees who sought an accommodation. The district court concluded, however, that the proposed Rule 23(b)(3) class for those subject to this onerous "accommodation" failed to satisfy the typicality, commonality, or predominance requirements because "masking and testing alone is insufficient to establish an adverse employment action." Appx.26, 35.

This conclusion ignored Plaintiffs' showing that this case is not about masking and testing in the abstract, but rather about a coercive masking-and-testing regime United concocted to punish employees who have medical or religious objections to the COVID-19 vaccine. In fact, the district court again failed to engage the record, only mentioning two allegations from the complaint and ignoring the evidence from class

discovery, which included dozens of depositions and thousands of documents.  Appx.39.

Plaintiffs laid out that evidence in great detail in their class certification motion, noting that: (1) United forced "accommodated" employees (and only accommodated employees) to wear respirators without proper training, fit testing, or oxygen breaks; (2) United required "accommodated" employees to wear these respirators in absurd circumstances, like when eating alone outdoors or while on personal travel; and (3) United unreasonably required "accommodated" employees (and only accommodated employees) to test while on vacation or immediately after recovering from COVID-19, despite CDC guidance to the contrary.  ECF No. 239 at 44.

Plaintiffs further showed how these rules were intentionally harsh. Kirby crafted the penalties for noncompliance with these rules, which included just one warning, then termination, to "sound[] very serious." ECF No. 239 at 2, 44.  And United made clear that this "accommodation" had nothing to do with an individualized assessment of anyone's job.  *Id.* at 19.  Indeed, the masking-and-testing rules applied to over a thousand employees with jobs ranging from airport operations to mechanics.  *Id.*

Thus, while the district court is correct that some masking-and-testing policies may be considered reasonable, Plaintiffs showed that United's "accommodation" was purposively punitive, harsh, and coercive. The entire proposed subclass faced this same unreasonable scheme, and therefore the subclass satisfies the commonality, typicality, and predominance requirements for a Rule 23(b)(3) class. This Court should therefore grant Plaintiffs leave to appeal to address these significant errors.

## III.   The ADA Plaintiffs Should Be Included In the Class.

The district court also erred when holding that two issues precluded employees with ADA claims from being part of any class. The court held that: (1) Because United did not provide all class members with the same accommodation, the reasonableness of the accommodation "cannot be determined on a class wide basis;" and (2) the determination of whether each Plaintiff has a "disability" is an individualized inquiry. Appx.11, 20-21, 35. But the district court's determination on each issue suffers from the same flaw described above—the court disregarded the extensive record showing how United's unpaid leave accommodation policy was

universal and unreasonable. That systemic policy raises class-wide issues that can and should be answered on a class-wide basis.

1. The district court's determination that employees with ADA claims may not be part of the proposed Rule 23(b)(2) class or Rule 23(b)(3) subclass was in error for the reasons already described above. The court ignored the common injury amongst *all* class members stemming from United's universal and coercive unpaid leave plan. ECF No. 239 at 16. And that injury was the same whether the employee was seeking an accommodation for religious or medical reasons. Plaintiffs, moreover, showed that United provided an accommodation beyond unpaid leave only after Plaintiffs initiated this lawsuit. *Id.* at 18–19. And even then, the other accommodation offered was the onerous and punitive masking-and-testing regime detailed above. All told, United offered only two accommodations to thousands of employees in dozens of different jobs. And that was the same for those requesting medical or religious accommodations.

The *only* difference for medical accommodation requesters was that, when forced onto unpaid leave, they were allowed to first burn through all of their sick leave before moving to unpaid leave. ECF

No. 239 at 16. A jury could therefore determine on a class-wide basis that treating every medical accommodation (and religious accommodation) the same was per se unreasonable, as the accommodation had nothing to do with the individual's specific disability. *See Holmes v. Godinez*, 311 F.R.D. 177, 217-18 (N.D. Ill. 2015).

2. The district court also erred in holding that a plaintiff's ability to demonstrate a "disability" under the ADA was an individualized inquiry incapable of class-wide treatment. Appx.20-21.

On this point, the district court improperly distinguished the sincerity question for Title VII class members from the disability question for ADA class members. *See id.* at 20. The court stated that, unlike sincerity, where employees face only "a light burden which is rarely challenged," litigants "frequently dispute whether an employee has a qualifying disability within the meaning of the ADA." *Id.* But the frequency of litigation about an element does not make that element more or less appropriate for class treatment. The critical question, rather, is whether "disability" can be determined on a class-wide basis.

Just as United required those with religious objections to articulate their beliefs and submit third-party verification of those beliefs, those

seeking accommodations for medical reasons had to articulate their physical or mental ailments and provide documentation from physicians corroborating those ailments.  ECF No. 239 at 14.  And United granted all requests where the employee provided this documentation and where United deemed the individual had "a disability or long term limitations." *Id.*  Thus, the only real difference between the sincerity question and the disability question is that courts have said the sincerity question is "easily established."  Appx.17.

The district court instead simply assumed that the ADA class members could not meet a higher threshold, but the court did not analyze any of the evidence showing that: (1) All employees seeking a medical accommodation submitted the same type of documentation; and (2) United itself admits it granted those requests for disabilities or "long term limitations."  ECF No. 239 at 14.  Given United's demand for medical documentation and the universal process it imposed on all employees seeking an accommodation, ADA class members can meet this higher burden, and they can do so on a class-wide basis.

It is thus unsurprising that the district court's conclusion conflicts with the conclusions of other courts.  When plaintiffs challenge such a

systemic and discriminatory policy, other courts have permitted ADA class actions to proceed.  ECF No. 239 at 33 (collecting cases).  Yet the district court only attempted to distinguish one of these cases, and it did so based on the assumption that there was not a systemic policy at play here.  Appx.14.  Because, as demonstrated above, the district court erred on that fundamental point, it offered no principled way to distinguish these ADA class action cases.

The ADA class is therefore no different from the Title VII class, as United treated all accommodated employees the same regardless of their disability, religious belief, or job title.  Thus, the ADA Plaintiffs should be included in the class definitions in this case.  And this Court should grant Plaintiffs leave to appeal in order to review the district court's refusal to certify any class for claims brought under the ADA.

## CONCLUSION

For all these reasons, leave to appeal should be granted here to resolve various consequential and novel questions regarding class certification when there is abundant evidence of a systemic, discriminatory, and punitive policy regarding religious and medical accommodations arising from an employer's policy.  As demonstrated

above, the district court incorrectly answered many questions when declining to certify several classes. In doing so, the district court overlooked extensive evidence and binding decisions from this Court and the Supreme Court. Accordingly, leave to appeal should be granted to address those errors.

July 5, 2024                                Respectfully submitted,

                                            */s/ Gene C. Schaerr*

John C. Sullivan                            Gene C. Schaerr
S | L LAW PLLC                                *Counsel of Record*
610 Uptown Boulevard                        Mark R. Paoletta
Suite 2000                                  Brian J. Field
Cedar Hill, TX 75104                        Cristina Martinez Squiers
Telephone: (469) 523-1351                   SCHAERR | JAFFE LLP
Facsimile: (469) 613-0891                   1717 K Street NW, Suite 900
john.sullivan@the-sl-lawfirm.com            Washington, DC 20006
                                            Telephone: (202) 787-1060
                                            Facsimile: (202) 776-0136
                                            gschaerr@schaerr-jaffe.com

                    *Counsel for Plaintiffs-Petitioners*

## CERTIFICATE OF COMPLIANCE

The foregoing petition complies with the type volume limitation of Fed. R. App. P. 5(c)(1) because it contains 4,705 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 5.

This petition also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Century Schoolbook font.

I further certify that (1) all privacy redactions have been made; and (2) that the brief has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Plaintiffs-Petitioners*

Dated: July 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2024, true and correct copies of the foregoing petition were served on counsel of record for Defendant-Respondent by email pursuant to agreement of the parties:

Donald J. Munro
Hashim M. Mooppan
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001-2113
dmunro@jonesday.com
hmmooppan@jonesday.com

Dated: July 5, 2024

/s/ Gene C. Schaerr
Gene C. Schaerr

*Counsel for Plaintiffs-Petitioners*

# PETITION APPENDIX

**Page**

Opinion & Order (June 21, 2024), ECF No. 263............................... Appx1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**DAVID SAMBRANO, ET AL.,**

    Plaintiffs,

v.                                                    **No. 4:21-cv-1074-P**

**UNITED AIRLINES, INC.,**

    Defendant.

## OPINION & ORDER

Before the Court is Plaintiffs' Motion for Class Certification and Appointment of Counsel. ECF No. 238. Having considered the Motion, briefs, and applicable law, the Court finds the Motion should be and is hereby **GRANTED in part** and **DENIED in part.** Additionally, Plaintiffs' Motion for Reconsideration (ECF No. 241) is **DENIED.**

## BACKGROUND

Plaintiffs' claims arise from United's COVID-19 vaccine mandate. On August 6, 2021, United announced that all U.S.-based employees must get vaccinated by September 27, 2021. United employees could request an accommodation for religious or medical reasons.

In November 2021, United put some unvaccinated flight crew employees who received accommodations on indefinite unpaid leave. All employees on unpaid leave had the option to apply for alternative positions, which varied widely in terms of location, pay, and required qualifications. Some applied; others didn't. Other accommodated employees were never put on unpaid leave but were instead required to wear masks and regularly submit COVID-19 test results. United ultimately allowed all employees on unpaid leave to return to work in March 2022. According to United's records, 5,885 employees submitted accommodation requests, 4,070 employees were granted an accommodation, 2,211 were put on unpaid leave, and 1,078 were required to mask and test.

**APPX1**

Plaintiffs sued on September 21, 2021, alleging employment discrimination and retaliation on behalf of themselves and other similarly situated employees. Plaintiffs say United violated the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII") by refusing to provide reasonable medical and religious accommodations. After two years, an appeal to the Fifth Circuit, and hundreds of filings, Plaintiffs filed the instant Motion for Class Certification and Appointment of Counsel. Plaintiffs ask the Court to certify the following classes:

1. <u>Rule 23(b)(2) Class</u>: "All individuals who submitted a request for a reasonable accommodation from United's COVID-19 vaccine mandate due to a sincerely held religious belief or medical disability and then faced the choice of: abandoning their religious beliefs or medical needs (i.e., get vaccinated); accepting indefinite leave; or being fired or otherwise separated."

2. <u>Rule 23(b)(3) Masking-and-Testing Subclass</u>: "[A]ll employees United deemed non-customer-facing who received an accommodation due to a sincerely held religious belief or medical disability and were subject to the purposely punitive masking-and-testing accommodation."

3. <u>Rule 23(b)(3) Unpaid Leave Subclass</u>: "[A]ll employees United deemed customer facing who received an accommodation due to a sincerely held religious belief or medical disability and who were put on unpaid leave."

ECF No. 238 at 23–24 (cleaned up).

**APPX2**

## LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). Federal Rule of Civil Procedure 23 controls whether this limited exception applies. A party seeking class certification thus "bear[s] the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). A plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, and so on." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545–46 (5th Cir. 2020) (internal quotations omitted).

Given the extraordinary nature of class actions, Rule 23 requires a "rigorous analysis." *Id.* Rule 23 requires courts "to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart*, 564 U.S. at 350–51. The Court must "understand the claims, defenses, relevant facts, and applicable substantive law to make a meaningful determination. If some of the determinations cannot be made without a look at the facts, then the judge must undertake that investigation." *Chavez*, 957 F.3d at 546. The Court must then "detail with specificity" the reasons for its conclusions, "explain and apply the substantive law governing the plaintiffs' claims to the relevant facts and defenses," and "articulat[e] why the issues are [or are not] fit for class wide resolution." *Id.* This is not a rubber-stamp procedure. *See Greathouse v. Cap. Plus Fin., LLC*, No. 4:22-CV-0686-P, 2023 WL 5746927, at *3 (N.D. Tex. Sept. 6, 2023) (Pittman, J.). "[T]he district court maintains great discretion in certifying and managing a class action." *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing *Montelongo v. Meese,* 803 F.2d 1341, 1351 (5th Cir. 1986)).

This arduous process exists because "certification can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit." *Id.* And further, after certifying a class, any judgment binds absent class members forever. *See Richardson v. Wells*

**APPX3**

*Fargo Bank, N.A.*, 839 F.3d 442, 454 (5th Cir. 2016). Thus, the "existence of a class fundamentally alters the rights of present and absent members." *Chavez*, 957 F.3d at 547.

## ANALYSIS

Plaintiffs ask the Court to certify a Rule 23(b)(2) class comprised of all employees who requested an accommodation, as well as two Rule 23(b)(3) subclasses comprised of all employees put on unpaid leave (the "Unpaid Leave Subclass") and all employees who had to mask and test (the "Masking-and-Testing Subclass"). *See* ECF No. 238 at 23–24. To certify any of these classes, the Court must find the class (1) is ascertainable, (2) satisfies Rule 23(a)'s prerequisite requirements, and (3) satisfies the specific requirements of either Rule 23(b)(2) or Rule 23(b)(3).

*First*, the Court finds that the Rule 23(b)(2) Class: (1) satisfies the ascertainability requirement; (2) does <u>not</u> satisfy all Rule 23(a) prerequisite requirements; and (3) does <u>not</u> satisfy Rule 23(b)(2)'s specific requirements. *Second*, the Court finds that the Masking-and-Testing Subclass: (1) satisfies the ascertainability requirement; (2) does <u>not</u> satisfy all Rule 23(a) prerequisite requirements; and (3) does <u>not</u> satisfy Rule 23(b)(3)'s specific requirements. *Third*, the Court finds that the Unpaid Leave Subclass: (1) satisfies the ascertainability requirement; (2) satisfies all Rule 23(a) prerequisite requirements with respect to the Title VII claims; and (3) satisfies Rule 23(b)(3)'s specific requirements with respect to the Title VII claims. Thus, the Court will <u>not</u> certify the 23(b)(2) Class or the 23(b)(3) Masking-and-Testing Subclass. But the Court will certify a class of all employees United deemed "customer-facing" who received an accommodation due to a sincerely held <u>religious</u> belief and who were put on unpaid leave. For these reasons, the Court will **GRANT in part and DENY in part** Plaintiffs' Motion for Class Certification and Appointment of Counsel (ECF No. 238).

**APPX4**

## I.    Ascertainability

The Fifth Circuit has articulated an "implicit 'ascertainability' requirement" for Rule 23 class certification. *In re Deepwater Horizon*, 739 F.3d 790, 821 (5th Cir. 2014); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."). "In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (cleaned up).

Plaintiffs argue the proposed classes are ascertainable because United has the records necessary to identify each class member. *See* ECF No. 238 at 24. The Court agrees, and United does not dispute that this requirement is met. *See* ECF No. 246 at 14–31. The threshold requirement for membership in the 23(b)(2) Class is that the class member requested an accommodation. United has detailed records of employees who submitted an accommodation request. *See* ECF No. 246 at 8. United's records can also show which employees were put on unpaid leave or were subject to United's masking-and-testing protocol, relevant for the proposed 23(b)(3) subclasses. *See id.* Thus, the proposed classes are ascertainable. The Court now turns to Rule 23(a)'s prerequisite requirements.

## II.    Rule 23(a) Prerequisite Requirements

Rule 23(a) prescribes four prerequisites for class certification: (1) that the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) that there are questions of law or fact common to the class ("commonality"); (3) that the claims and defenses of the parties are typical of the claims or defenses of the class ("typicality"); and (4) that the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). FED. R. CIV. P. 23(a); *see also Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023). The Court addresses each below.

**APPX5**

### A. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). To meet this standard, a plaintiff "must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981).

Plaintiffs meet this standard. Plaintiffs estimate that more than 5,000 accommodation requests were submitted and nearly 2,300 were approved. *See* ECF No. 239 at 25. Of the 2,300 employees whose accommodation requests were approved, Plaintiffs estimate that over 1,000 were put on indefinite unpaid leave and at least 800 were required to mask and test. United's records show that 5,885 accommodation requests were submitted, 4,070 employees were granted an accommodation, 2,211 were put on unpaid leave, and 1,078 were required to mask and test. *See* ECF No. 246 at 8. Thus, it's clear that the classes are sufficiently numerous—each containing hundreds or thousands of class members. *See Mullen*, 186 F.3d at 624 (a class size of 100 to 150 members "is within the range that generally satisfies the numerosity requirement"). The Court next addresses Rule 23(a)'s commonality requirement.

### B. Commonality

Commonality requires "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). A common question must be "of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Stukenberg*, 675 F.3d at 834. This serves the ultimate purpose of the class action procedure: efficiency. If every individual plaintiff requires his or her own in-depth factual analysis, the purpose of the class action is defeated—rendering the litigation unruly and inefficient. *See id.*

Because the commonality test focuses on issues that are "central to the validity of each one of the claims," courts must analyze commonality through the lens of "the elements of the underlying cause of action."

*Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766–67 (5th Cir. 2020). The Court will discuss the proposed Rule 23(b)(2) Class, the Masking-and-Testing Subclass, and the Unpaid Leave Subclass separately.

    1.  Rule 23(b)(2) Class

    As an initial matter, the Court notes that commonality is not, as Plaintiffs represent, a low bar. Plaintiffs argue that "the test for commonality is not demanding," and the bar is "not particularly high." *See* ECF No. 256 at 6, 9. Not so. Before the Supreme Court's decision in *Wal-Mart v. Dukes*, the Fifth Circuit had indeed held "the commonality hurdle is not particularly high." *Smith v. Texaco, Inc.*, 263 F.3d 394, 405 (5th Cir. 2001), *opinion withdrawn, cause dismissed*, 281 F.3d 477 (5th Cir. 2002) (internal citation omitted); *see also James v. City of Dall.*, 254 F.3d 551, 570 (5th Cir. 2001) ("The test for commonality is not demanding."). Pre-*Walmart*, commonality was met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Smith*, 263 F.3d at 405. Thus, prior Fifth Circuit caselaw held "the interests and claims of the various plaintiffs need not be identical," and "the fact that some of the Plaintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality." *Stukenberg*, 675 F.3d at 839–40.

    But in *Wal-Mart*, the Supreme Court held all class members' claims must depend on a common issue of law or fact the determination of which "will *resolve* an issue that *is central* to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Accordingly, the Fifth Circuit observed in *Stukenberg* that "the *Wal-Mart* decision [] heightened the standards for establishing commonality under Rule 23(a)(2)." 675 F.3d at 839. In vacating the district court's class certification, the court in *Stukenberg* explained: "the district court relied, in large part, on this circuit's pre-*Wal-Mart* case law finding that '[t]he test for commonality is not demanding.'" *Id.* (citation omitted). The court explained that post-*Wal-Mart*, commonality can no longer be satisfied if the interests, claims, and injuries of the plaintiffs are varied. Rather, "commonality requires the plaintiff to demonstrate that the class members 'have suffered the *same injury*.'" *Id.* at 840 (emphasis

**APPX7**

added) (citing *Wal-Mart*, 564 U.S. at 350).[1] In the present case, this is a distinction with a difference.

    a.  *The Rule 23(b)(2) Class members have different injuries.*

    Plaintiffs' proposed Rule 23(b)(2) Class includes everyone who sought an accommodation based on a sincerely held religious belief or medical disability. *See* ECF No. 238 at 23. Plaintiffs theorize that United's unpaid leave policy forced employees to choose between "abandoning their religious beliefs or medical needs," (in other words, choosing to get vaccinated), "accepting unpaid leave" (even though many employees were never put on unpaid leave), or "being fired or otherwise separated" (if they refused the vaccine without an accommodation). *Id.* The "glue" holding these injuries together is the idea that United "operated under a general policy of discrimination through its accommodation process and the accommodations it provided to employees." *Id.* at 27. And Plaintiffs propose two primary common questions: (1) "whether United violated the law with its intentionally harsh masking-and-testing accommodation;" and (2) "whether universal unpaid leave is a lawful accommodation." *Id.*

    For the first question, Plaintiffs argue that "determining [whether] United's harsh masking-and-testing accommodation was unlawful will resolve additional claims brought by a large part of the class." *Id.* If the Court applied pre-*Wal-Mart* caselaw, this question might suffice. *See*

---

    [1]Notably, Plaintiffs misquote a footnote parenthetical in *In re Rodriguez* for the proposition that "commonality exists even when 'Plaintiffs may have different claims, or claims that may require some individualized analysis.'" ECF No. 256 at 6 (citing *In re Rodriguez*, 695 F.3d 360, 367 n.9 (5th Cir. 2012)). Quite the opposite, the parenthetical in *Rodriguez* correctly notes:

> [C]ontrary to prior Fifth Circuit caselaw that "the fact that some of the Plaintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality," the Supreme Court held in *Wal–Mart v. Dukes*, that "commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."

695 F.3d 360, 367 n.9 (5th Cir. 2012) (cleaned up). In other words, *Rodriguez* observes the exact opposite proposition—post-*Wal-Mart*, commonality does not exist when plaintiffs have different claims or claims that require individualized analysis. Instead, all class members must have the *same injury*.

**APPX8**

*Stukenberg*, 675 F.3d at 839–840 ("Before *Wal-Mart*, . . . the commonality test [was] met when there is at least *one issue* whose resolution will affect all or *a significant number* of the putative class members." (cleaned up) (emphasis added)). But post-*Wal-Mart*, commonality is met when an issue that is central to the validity of *each one* of the class members' claims can be resolved *in one stroke*. *See Wal-Mart*, 564 U.S. at 350. Resolution of the masking-and-testing issue does no such thing, and thus, this question is not common to the class.

For the second question, Plaintiffs argue a determination that indefinite unpaid leave was unlawful "will resolve claims across the board." ECF No. 256 at 28 ("In all, the legality of United's universal and punitive accommodations is a common question that can be resolved on a classwide basis."). The first and most obvious issue with this theory is that not all employees in the Rule 23(b)(2) Class were put on unpaid leave. Thus, any determination of legality vis-à-vis unpaid leave would only resolve "in one stroke" the claims of the Unpaid Leave Subclass, not the entire Rule 23(b)(2) Class. For instance, a determination that unpaid leave was unlawful does not further the claims of those employees who masked and tested, worked remotely, changed jobs, or decided to get vaccinated—all of whom are part of the proposed Rule 23(b)(2) Class. Because not all Plaintiffs in the Rule 23(b)(2) Class "have suffered the same injury," the proposed class does not satisfy commonality. *Stukenberg*, 675 F.3d at 840 (citing *Wal-Mart*, 564 U.S. at 350). It is not enough that Plaintiffs allege they "all suffered a violation of the same provision of law." *Wal-Mart*, 564 U.S. at 350.

But Plaintiffs don't even allege that much, as the Rule 23(b)(2) Class includes claims under both Title VII (religious discrimination) and the ADA (disability discrimination). Because the Court must analyze Plaintiffs' common question through the lens of "the elements of the underlying cause of action," *Flecha*, 946 F.3d at 766–67, the Court will briefly discuss the elements needed to prove United's unpaid leave policy was unlawful.

With regard to religious discrimination, courts analyze a Title VII claim for failure to accommodate under a burden-shifting framework akin to that in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**APPX9**

*See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014). "The employee must first establish a prima facie case of religious discrimination." *Id.* (citing *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013)). To do so, a plaintiff must show: (1) they held bona fide religious beliefs, (2) the belief conflicted with a requirement of employment, (3) the employer was informed of the belief, and (4) they suffered an adverse employment action for failing to comply with the conflicting requirement. *See id.* If a plaintiff makes out a prima facie case, the burden shifts to the defendant to show either: (1) that it reasonably accommodated the employee; or (2) that it was unable to do so without undue hardship. *See id.*

For the moment, the Court focuses on the fourth element of the prima facie case: adverse action. The alleged adverse actions vary among the Rule 23(b)(2) Class—some were put on unpaid leave, some were required to mask and test, some changed jobs, and others decided to get vaccinated. And the lawfulness of United's unpaid leave policy cannot be determined across the proposed class without reference to a specific adverse employment action. Because the alleged adverse actions differ within the proposed class, all putative class members have not suffered the same injury and their claims cannot be productively litigated at once.[2] *Wal-Mart*, 564 U.S. at 350.

Further, even if all Rule 23(b)(2) Class members could establish a prima facie case of religious discrimination, the burden would shift to United to show that the accommodation was reasonable. *See Davis*, 765 F.3d at 485. A jury could find, for example, that United's masking and testing protocol was a reasonable accommodation, but indefinite unpaid leave was not. This further suggests the class members' claims are not conducive to class-action litigation. *See Wal-Mart*, 564 U.S. at 350.

The same is true for the ADA claims. "To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its

---

[2]The Court has already rejected Plaintiffs' contention that United's initial decision to put all unvaccinated employees on unpaid leave was itself an adverse action, as that decision was never carried out. *See* ECF No. 231 at 8.

**APPX10**

consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Milteer v. Navarro Cnty., Tex.*, 652 F. Supp. 3d 754, 762 (N.D. Tex. 2023) (Fitzwater, J.) (citing *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)). The reasonableness of United's accommodations under the ADA cannot be determined on a class-wide basis because United did not provide the same accommodation to all class members. Nor can the factfinder determine in one stroke whether each class member had a qualifying disability within the meaning of the ADA. *See infra*, Part II(B)(3)(b). Accordingly, the lawfulness of United's accommodations under the ADA cannot be determined on a class-wide basis.

For these reasons, the Court finds Plaintiffs' proposed common questions do not generate common answers for the Rule 23(b)(2) Class. And the Court finds no other questions common to the Rule 23(b)(2) Class that would resolve an issue central to the validity of each class member's claim in one stroke.

### b. *A "general policy of discrimination" does not hold together the Rule 23(b)(2) Class members' injuries.*

Plaintiffs strain to argue the above injuries can be tied together because they arise from the same accommodation policy. Borrowing language from *Wal-Mart*, "a general policy of discrimination," they argue, demonstrates commonality. ECF No. 256 at 26 (citing *Wal-Mart*, 564 U.S. at 353). But examination of *Wal-Mart* reveals that "a general policy of discrimination" cannot tie together the injuries at issue here.

In *Wal-Mart*, three named plaintiffs—who sought to certify a class of 1.5 million employees—alleged that Wal-Mart discriminated against them based on sex by refusing to hire and promote women. *See Wal-Mart*, 564 U.S. at 343. The plaintiffs alleged "the discrimination to which they have been subjected is common to *all* Wal-Mart's female employees," and a strong and uniform corporate culture permits bias against women to, "perhaps subconsciously," infect the discretionary decision-making of each one of Wal-Mart's thousands of managers. *Id.* at 345. Thus, the plaintiffs claimed that "every woman at the company [is] the victim of one common discriminatory practice." *Id.* The plaintiffs

**APPX11**

sought to certify a class of people across many facilities nationwide, some of whom were wrongfully denied promotions and others who were wrongfully denied jobs.

In addressing commonality, the Supreme Court explained there is a conceptual gap between (1) an individual's claim that they have been discriminated against, and (2) "the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact." *Id.* at 353. To bridge this gap, the Supreme Court theorized that "significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.* In other words, if Wal-Mart had a company-wide policy of discriminating against women, then plaintiffs across the country—whether they were passed over for a promotion or turned down for a job—could point to a single, company-wide policy as the common answer to the question: "why was I disfavored?" *Id.* at 352–353.

Thus, a class can demonstrate commonality by identifying a "general policy of discrimination." *See id.* It is *not* an alternative commonality analysis, under which a court may certify a class of varied injuries. Crucially, to satisfy the commonality requirement, a plaintiff must always show "the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact." *Id.* at 353. *Wal-Mart* did not change this requirement; it simply noted an identifiable policy may serve as a common denominator that satisfies the inquiry.

Here, Plaintiffs take this to mean that general discussions of United's corporate culture, led by CEO Scott Kirby, can tie together the Rule 23(b)(2) Class's various claims and injuries. As Plaintiffs see things, United's disparate accommodation decisions "were enacted by the same officials in defendant's central office [and] they affected the class as a whole." *See* ECF No. 256 at 34 (cleaned up); *see also id.* at 26 ("[T]he 'glue' holding the claims together here is [] United's 'general

**APPX12**

policy' of disdain for anyone who dared not march in lockstep with its vaccine mandate.").

Review of cases applying *Wal-Mart* to certify a class undermines Plaintiffs' position. In the few cases that have done so, the respective courts identified policies that were facially discriminatory or otherwise illegal in every case, as opposed to a policy that might be illegal as applied to certain individuals. Indeed, the two out-of-circuit cases on which Plaintiffs rely make this clear, as both suggest a general policy of discrimination cannot justify class certification when the proposed class members have different injuries.

*First*, in *Sughrim v. New York*, a group of correctional officers sought to certify a class for violations of Title VII, claiming that the prison system's accommodation policies failed to accommodate their dress and grooming needs. *Sughrim v. New York*, No. 19CV7977RASDA, 2023 WL 5713191, at *26 (S.D.N.Y. Sept. 5, 2023) (Abrams, J.). The plaintiffs alleged the New York State Department of Corrections and Community Supervision ("DOCCS") treated different religious practices differently, "granting religious accommodations for members of some faiths but denying accommodations to others." *Id.* The common questions in *Sughrim* were: (1) "whether DOCCS denied officers' applications absent a finding of undue hardship," and (2) "whether DOCCS had a practice of denying applications based on the tenets of officers' faiths." *Id.* DOCCS argued the plaintiffs did not satisfy commonality because they were members of different religions and had "'lumped' together 'Pagan, Heathen, Odinist, Asatru, Forn Sidr, and other variations of Norse Pagan religious traditions,' defeating commonality." *Id.* The court held that the fact the plaintiffs came from different religious traditions did not undermine commonality—all plaintiffs "challenge central and systemic failures of Defendants' religious accommodation policies as they affect the class as a whole." *Id.* at *24–25.

Plaintiffs ask the Court to view the Rule 23(b)(2) Class not as "a series of individualized inquiries," but as a challenge to United's central and systemic failure to reasonably accommodate its employee's religious beliefs and medical conditions. Plaintiffs cite *Sughrim* for the proposition that failure-to-accommodate claims can be certified as a

13

**APPX13**

class "where, as here, the same officials in defendant's central office decided whether to grant the request," and the plaintiffs challenge "systemic failures of the defendants to comply with Title VII." *See* ECF No. 238 at 32–33. But *Sughrim* doesn't apply here. Crucially, unlike here, the plaintiffs in *Sughrim* suffered the same injury—denial of their religious accommodation requests. *Sughrim* stands for the uncontroversial proposition that a defendant's "general policy of discrimination" against multiple religions does not undermine commonality when plaintiffs from different religions suffer the same injury.

*Second*, in *Holmes v. Godinez*, a group of deaf and hard-of-hearing inmates brought a putative class action against the Illinois Department of Corrections ("IDOC"). 311 F.R.D. 177 (N.D. Ill. 2015). The plaintiffs sought to certify a class of deaf and hard-of-hearing inmates who require accommodations. They proposed several common questions including, among others, "whether IDOC systematically failed to provide class members with effective communication and adequate access to its programs and services" and "whether IDOC provides class members with safe and effective visual notification systems to advise them of emergencies." *Id.* at 218. *Holmes* challenged IDOC's system-wide failure to provide accommodations, and the court explained that "[t]his litigation will focus on whether IDOC's policies and procedures are illegal as applied to all hearing impaired inmates, and thus will not depend on [] intensive individualized analysis." *Id.* at 222.

Here, however, the various accommodations provided by United and the various injuries alleged make it impossible to determine in one stroke whether United's accommodation policy was illegal as to all employees. As noted, while United's unpaid leave policy may have been unlawful, its masking-and-testing protocol may not have been. Determining the legality of United's unpaid leave policy does not resolve the masking-and-testing claims, and vice versa. It is therefore impossible to determine that United's overarching policy was unlawful "as applied to all" putative class members in the Rule 23(b)(2) Class. Thus, the proposed class does not satisfy commonality. The Court turns now to the Rule 23(b)(3) Masking-and-Testing Subclass.

14

**APPX14**

2. Rule 23(b)(3) Masking-and-Testing Subclass

Plaintiffs ask the Court to certify a subclass consisting of "all employees United deemed non-customer-facing who received an accommodation due to a sincerely held religious belief or medical disability and were subject to the purposely punitive masking-and-testing accommodation." ECF No. 238 at 23–24 (cleaned up). For the reasons below, the Court concludes the Masking-and-Testing Subclass does not satisfy commonality either.

This Court has already held that Plaintiffs who were required to mask and test did not suffer a more than *de minimis* adverse employment action. "Employers across the country imposed these requirements in response to the COVID-19 pandemic, and trial courts should not be in the business of scrutinizing these details of personnel management in such extraordinary circumstances." *Sambrano v. United Airlines, Inc.*, No. 4:21-CV-1074-P, 2023 WL 8721437, at *4 (N.D. Tex. Dec. 18, 2023) (Pittman, J.). But to the extent the Masking-and-Testing Subclass alleges they have suffered a more than *de minimis* adverse action, the nature of the adverse action will necessarily vary. David Castillo, for example, complains that United required "that he wear an N-95 respirator at all times while at work, eat his meals alone and outdoors, and provide regular COVID-19 test results." ECF No. 156 at 27. For Mr. Castillo, the masking requirement "limited his ability to communicate with colleagues during important maintenance activities." *Id.* In contrast, Ms. Hamilton alleges that as a result of United's masking requirement, her coworkers harassed her by "spraying Lysol into her area making it hard for her to breathe." *Id.* at 29.

Because masking and testing is not, by itself, an adverse action, whether an employee in this subclass can make out their prima facie case will depend on a fact-specific inquiry. The Supreme Court's recent ruling in *Muldrow v. City of St. Louis* underscores this point. *See* ___ U.S. ___, 144 S. Ct. 967, 974 (2024) ("To make out a Title VII discrimination claim, a[n] [employee] must show *some harm* respecting an identifiable term or condition of employment." (emphasis added)). Whether any individual employee suffered some harm as a result of United's masking-and-testing protocol depends on the facts, but

15

**APPX15**

Plaintiffs' Complaint does not allege that all employees suffered the *same harm* as a result of the protocol.

Accordingly, the Rule 23(b)(3) Masking-and-Testing Subclass suffers the same deficiency as the Rule 23(b)(2) Class—all putative class members did not suffer the same injury. Some allege that masks made it difficult to communicate with coworkers, others allege they experienced harassment and difficulty breathing. But, by itself, the masking-and-testing requirement won't cut it. Thus, the Rule 23(b)(3) Masking-and-Testing Subclass cannot resolve an issue that is central to the validity of each class member's claim in one stroke, and it fails the commonality requirement accordingly.

### 3. Rule 23(b)(3) Unpaid Leave Subclass

Plaintiffs also ask the Court to certify a Rule 23(b)(3) subclass consisting of "all employees United deemed customer facing who received an accommodation due to a sincerely held religious belief or medical disability and who were put on unpaid leave." ECF No. 238 at 23–24 (cleaned up). Unlike the Rule 23(b)(2) Class and the Rule 23(b)(3) Masking-and-Testing Subclass, all employees who were put on indefinite unpaid leave suffered the same injury. Thus, a class-wide proceeding could generate common answers for this Subclass—at least, for the Title VII claims.

For the Unpaid Leave Subclass, United argues five issues require individualized assessment, precluding commonality: (1) whether the Title VII class members' religious beliefs were sincere; (2) whether the ADA class members had a qualifying disability; (3) whether the unpaid leave accommodation was reasonable; (4) whether the class members suffered an adverse action; and (5) whether United would incur undue hardship in providing an alternative accommodation. The Court agrees on the second point. But on all others, the Court concludes that these issues do not undermine commonality.

16

**APPX16**

a. *The sincerity issue does not undermine commonality.*

For class members bringing claims for religious discrimination, United argues that the sincerity of religious beliefs is an individualized inquiry that precludes class certification. The Court disagrees. As an initial matter, the sincerity of a plaintiff's religious belief is not an exacting inquiry. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (in evaluating sincerity, "[t]he Court's 'narrow function . . . is to determine' whether the plaintiffs' [asserted religious belief] reflects 'an honest conviction'"); *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791 (5th Cir. 2012) ("[s]incerity is generally presumed or easily established" and any inquiry "must be handled with a light touch, or judicial shyness"). It's true that a person's religious beliefs are deeply individualized and personal, but "the contours of those beliefs are purely objective." *DeOtte v. Azar*, 332 F.R.D. 188, 197 (N.D. Tex. 2019) (O'Connor, J.). And the Court "need not—indeed, *may not*—delve into each individual's [] state of mind." *Id.* Courts have few occasions to conduct this part of the inquiry, as "the sincerity of a religious belief is not often challenged." *Moussazadeh*, 703 F.3d at 791. But when courts in the Fifth Circuit have analyzed sincerity, they "have looked to the words and actions" of the plaintiff. *Id.* Here, the words and actions of the Unpaid Leave Subclass evince the sincerity of their religious beliefs.

*First*, with regard to the employees' *words*, the putative class members sought a religious exemption in the first place. In doing so, employees were required to articulate a religious reason for not receiving the vaccine. Employees were also required to submit a letter from a third party—someone the employee knew firsthand—who would attest to the employee's sincerely held religious belief. *See* ECF No. 238 at 14. Because these employees articulated a religious reason for not receiving the vaccine and a third-party attested to the sincerity of that belief, United granted their accommodation requests. Thus, the employees' own words and the words of all attesting third parties indicate that the class members had sincere religious objections to the vaccine. *See U.S. Navy SEALs 1-26 v. Austin*, 594 F. Supp. 3d 767, 780 (N.D. Tex. 2022) (O'Connor, J.), *appeal dismissed as moot sub nom.*, *U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666 (5th Cir. 2023) ("[E]veryone

**APPX17**

eligible for the class has submitted a religious accommodation request, and no one may submit that request without a chaplain's memorandum attesting to the applicant's sincerity. Thus, all potential class members have carried their (light) burden of demonstrating their religious beliefs are sincere.").

*Second*, as to the employees' *actions*, the putative class members chose to accept indefinite unpaid leave rather than get vaccinated—a difficult decision that itself evinces the sincerity of their belief. To be sure, non-religious beliefs may motivate a person to forego a vaccine and accept unpaid leave (e.g., safety concerns). But a decision to accept unpaid leave in conjunction with a professed religious objection and a third-party attestation to the sincerity of that objection—taken together—are sufficient to demonstrate sincerity. *See Moussazadeh*, 703 F.3d at 791. Additionally, because the Unpaid Leave Subclass is comprised of employees who were put on unpaid leave "due to a sincerely held religious belief," any person who opts into the class further contends that they had a sincere religious objection to the vaccine. *DeOtte*, 332 F.R.D. at 197 ("So long as those employers and individuals who opt into the proposed classes contend that the contraceptive mandate is forbidden by their sincerely held religious beliefs, the Court must accept those contentions.").

United relies heavily on the Fifth Circuit's decision in *Braidwood Management, Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023). In *Braidwood*, the plaintiffs sought to certify a class consisting of "all employers that oppose homosexual or transgender behavior for sincere religious reasons." *Id.* at 921. The employer-defendants argued that the application of Title VII to these employers would substantially burden their exercise of religion, implicating the Religious Freedom Restoration Act ("RFRA"). *See id.* To qualify for RFRA's protection, an asserted belief must be "sincere," making sincerity a salient issue in *Braidwood*.[3] The

---

[3]United cites *Braidwood* for the proposition that "the sincerity 'determination can be made only on a case-by-case basis and not at [a higher] level of abstraction at the class-certification stage.'" ECF No. 246 at 16. But the court applied this line of reasoning expressly to the *employer-defendants' organizations. See Braidwood*, 70 F.4th at 935. This issue of whether religion plays an important role in an *organization* is an entirely different and much

court held that just because "a review of religious sincerity may not be demanding does not mean it is a non-existent requirement or non-essential for Rule 23 purposes." *Braidwood*, 70 F.4th at 935. For commonality, it is not enough to say that "sincerity does not require an exacting review." *Id.*

Here, while sincerity indeed "does not require an exacting review," *see id.*, the Unpaid Leave Subclass would demonstrate sincerity even if it did. Viewing the facts of this case holistically, the words and actions of members in the Unpaid Leave Subclass demonstrate sincerity. *See Moussazadeh*, 703 F.3d at 791. Motivated by religious beliefs, they opted out of a vaccine in the middle of a life-threatening global pandemic. *See* ECF No. 156 at 32–34. They were willing to face the professional and social ramifications of seeking a contentious religious accommodation to do so. *See id.* They went through a formal process to seek such accommodations. *See id.* Their religious affiliates and/or members of the clergy attested to the sincerity of their believe. *See id.* And to put their money where their mouth was, they accepted unpaid leave to adhere to their religious convictions. *See id.* Now they seek to undergo the arduous process of litigation to vindicate those sincere beliefs. In whole and in part, these words and actions are not the words and actions of someone with insincere religious beliefs. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 216–17 (1972) (examining external behaviors in addition to assertion of sincerity to determine religious beliefs of Old Order Amish were

---

more exacting inquiry than the sincerity of an employee's religious beliefs under Title VII. In the organizational context, courts analyze nine factors, including: (1) whether the entity operates for a profit; (2) whether it produces a secular product; (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose; (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue; (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees; (6) whether the entity holds itself out to the public as secular or sectarian; (7) whether the entity regularly includes prayer or other forms of worship in its activities; (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and (9) whether its membership is made up by coreligionists. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (cited in *Braidwood*, 70 F.4th at 935 n.45). This fact-intensive and highly-individualized inquiry is inapplicable to the sincerity analysis here.

**APPX19**

sufficiently sincere to exempt them from compulsory public-school attendance laws); *U.S. v. Seeger*, 380 U.S. 163, 186 (1965) (examining external behaviors in addition to assertion of sincerity to determine non-taxonomized religious beliefs were sufficiently sincere to qualify belief-holder for conscription exemption); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) (finding a religious belief was sincere despite plaintiff's inability to "articulate his belief precisely" where he explicitly stated he "quit [his job] due to his religious convictions"); *Moussazadeh*, 703 F.3d 781, 791–92 (5th Cir. 2012) (finding deviations from religious observance did not undermine asserted sincerity where sincerity was shown "though [plaintiff's] initial claims, his actions while [incarcerated], and his *continued prosecution of this suit*" (emphasis added)). Accordingly, *Braidwood* does not foreclose class certification in this case.

b.  *The disability issue undermines commonality for Plaintiffs' ADA claims.*

The Court now turns to the Unpaid Leave Subclass members' ADA claims. For class members alleging disability discrimination, United argues that the existence of a qualifying disability is an individual inquiry. On this point, the Court agrees. Unlike the sincerity element of a Title VII religious discrimination claim—a light burden which is rarely challenged—parties frequently dispute whether an employee has a qualifying disability within the meaning of the ADA.

To prevail on an ADA failure-to-accommodate claim, a plaintiff must show: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations. *See Milteer*, 652 F. Supp. 3d at 762 (citing *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)). For the first element, the ADA defines a "disability" as (a) a physical or mental impairment that substantially limits one or more major life activities, (b) a record of such an impairment, or (c) being regarded as having such an impairment. *Id.* at 762 (citing 42 U.S.C. § 12102(1)). Thus, the ADA "requires an individualized assessment of the impact of the impairment on an

**APPX20**

individual's major life activities." *Mueck v. LaGrange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023) (emphasis added).

Because the disability element requires an individual assessment, the Court cannot resolve Plaintiffs' ADA claims in one stroke. The Unpaid Leave Subclass includes employees with an array of disabilities. Some may qualify and require accommodation under the ADA, others may not. *See* ECF No. 246 at 19. United is entitled to argue that some employees who requested accommodations do not have a qualifying disability within the meaning of the ADA, and thus, class certification for Plaintiffs' ADA claims is inappropriate. *See Chandler v. City of Dall.*, 2 F.3d 1385, 1396 (5th Cir. 1993) (determinations "of whether an individual is handicapped [are] necessarily individualized inquiries" for which "class certification and class relief [are] inappropriate").

### c. *The adverse action issue does not undermine commonality.*

United also argues that whether class members suffered an adverse action is a question that cannot be resolved on a class-wide basis. The Court disagrees. Here, all class members suffered the same adverse action—indefinite unpaid leave. As this Court has already noted, indefinite unpaid leave is clearly a more than *de minimis* adverse employment action. *See* ECF No. 231 at 8. And because all employees in the proposed subclass were put on unpaid leave, they all suffered the same adverse employment action.

### d. *The reasonableness issue does not undermine commonality.*

Similarly, the reasonableness of United's indefinite unpaid leave accommodation is a question that can be resolved on a class-wide basis. It's true that "whether an accommodation is reasonable is a fact-specific inquiry." ECF No. 231 at 9. However, because the accommodation in this case is the same across the proposed class, the only factual differences between individual class members are questions of damages. The commonality requirement can be satisfied "by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *In re Deepwater Horizon*, 739 F.3d at 810–11.

**APPX21**

United raises two arguments on reasonableness. *First*, United argues the unpaid leave accommodation was not the same for each class member because some employees were able to draw on sick pay, take vacation time, or rely on other streams of income. ECF No. 246 at 23. Indeed, some employees who were put on unpaid leave may have been able to use up their accrued vacation time to offset their losses for some time, but that does not prevent class certification. If anything, these varying circumstances are likewise a question of damages. And these individual circumstances do not change the uniform nature of United's unpaid leave accommodation—employees put on unpaid leave stopped receiving their paycheck once they ran out of vacation days. The fact that every employees' financial circumstances are not identical does not undermine commonality either. United points out that employees' individual circumstances varied, including their "current financial resources," whether they have "another breadwinner in the family," or their "potential outside earning opportunities during leave." *Id.* But whether an employee's spouse also earns an income does not factor into the reasonableness of a religious accommodation.

*Second,* United argues that reasonableness may vary between employees because every employee on unpaid leave had the option to apply for a non-customer-facing job. United apparently argues that the reasonableness of an employee's accommodation depends on the jobs available to that employee, which "varied widely in terms of location, pay, qualifications, and the like." *Id.* at 11. The Court disagrees. The accommodation was the same across the board—all employees in the Unpaid Leave Subclass were put on unpaid leave. Having an opportunity to apply for (but no guarantee of receiving) a new job does not tether the reasonableness inquiry to the jobs an employee might have received had they applied. The common question is whether United's unpaid leave accommodation was reasonable. The fact that employees could have applied for other jobs may be relevant to the reasonableness of the unpaid leave accommodation, but the job offers they might have received are not. Such an inquiry would be irrelevant and speculative.

**APPX22**

e. _The undue hardship issue does not undermine commonality._

Finally, United argues that a factfinder cannot determine—without individualized inquiry—whether United would have incurred undue hardship in providing an alternative accommodation, such as masking and testing for customer-facing employees. *See Groff v. DeJoy*, 600 U.S. 447, 468 (2023) ("[U]ndue hardship is shown when a burden is substantial in the overall context of an employer's business." (quotations omitted)). United contends that variations in testing capabilities at different airports, different working conditions and risks, differences in state law, and the unavailability of reserve crews at certain airports make a class-wide analysis impossible. ECF No. 246 at 25. The Court disagrees.

As an initial matter, the Court notes that United somehow managed to require masking-and-testing for over 1,000 non-customer facing employees across the country, overcoming the supposed logistical and state law hurdles they now argue preclude class certification. *See id.* at 8. Plaintiffs say they will present testimony about the costs of testing, "which will address logistics at hub airports and non-hub airports." ECF No. 256 at 12. Plaintiffs also say they will present testimony about "the costs of employees taking tests themselves and providing results," and any state laws that may be implicated in such a policy. *Id.* Indeed, United's two-sentence point on variations in state law refers to some state laws "that could be interpreted as requiring the employer to pay for COVID-19 testing," thereby increasing the costs associated with testing for employees in those states. *See* ECF No. 77 at 6. But the question of whether United would have incurred a substantial burden by paying for some employees' COVID-19 tests is a question that can be resolved class-wide. And again, United managed to make it work for its non-customer-facing employees—apparently without incurring undue hardship.

Further, the unavailability of reserve crews at certain airports does not create individualized questions of undue hardship. United argues that masking and testing at airports without reserve crews would create an undue hardship because positive COVID-19 tests would result in cancelled flights. *See* ECF No. 246 at 25. Of course, the risk of

**APPX23**

unexpected illness was not limited to unvaccinated employees. Employees who got the shot could also catch COVID-19 (or the flu), resulting in staffing shortages. And increasing the number of available employees (i.e., requiring employees to mask and test instead of putting everyone on unpaid leave) would *alleviate* those staffing shortages—not exacerbate them. Thus, United's argument that masking and testing could cause staffing shortages is unavailing—especially when United's solution was to prevent its customer-facing staff from working at all. Stephen Jones, *Why are so many flights being canceled?*, BUS. INSIDER (Jul. 23, 2022, 4:53 AM), https://www.businessinsider.com/airlines-labor-shortage-cancelling-flights-aviation-jobs-market-2022-6 ("Airlines have collectively canceled thousands of flights, with labor shortages often being blamed."). Accordingly, the question of whether United would have incurred a "burden [that] is substantial in the overall context of [its] business" by offering an alternative accommodation is a question that is common to the class. *See Groff*, 600 U.S. at 468.

Of United's five proposed individualized issues—sincerity, disability, reasonableness, adverse action, and undue hardship—one persuades. The Court thus finds that the Unpaid Leave Subclass' Title VII claims satisfy commonality, but the ADA claims do not.

\*    \*    \*

For the above reasons, the Court concludes that the Rule 23(b)(2) Class and the Rule 23(b)(3) Masking-and-Testing Subclass fail to satisfy commonality. The Rule 23(b)(3) Unpaid Leave Subclass satisfies commonality for its Title VII claims, but not its ADA claims. The Court now turns to typicality.

### C. Typicality

The typicality test concerns three questions: (1) whether other members have the same or similar injury; (2) whether the action is based on conduct which is not unique to the named plaintiffs; and (3) whether other class members have been injured by the same course of conduct. *Miller v. Grand Canyon Univ., Inc.*, 540 F. Supp. 3d 625, 634–35 (N.D. Tex. 2021) (Pittman, J.) (citations omitted). In short, "class certification should not be granted if there is a danger that absent class members

will suffer if their representative is preoccupied with defenses unique to it." *Id.*; *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) ("[T]he critical inquiry is whether the named plaintiff's claims have the same essential characteristics as those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." (cleaned up)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."). Having considered the three typicality questions, the Court concludes that the Title VII Unpaid Leave Subclass meets the typicality requirement, but the Rule 23(b)(2) Class and the Rule 23(b)(3) Masking-and-Testing Subclass do not.

*First*, as discussed above, all members of the Title VII Unpaid Leave Subclass suffered the same injury. The named Plaintiff, Genise Kincannon, and the other subclass members were all put on unpaid leave. This policy was uniformly applied to the entire class. *Second*, the action is based on conduct which is not unique to Ms. Kincannon. United's unpaid leave policy was the same across the board. United's uniform application of this policy means that the legal and factual questions relevant to Ms. Kincannon are the same as those relevant to the other subclass members. *Third*, for the same reason, all members of the Unpaid Leave Subclass have been injured by the same course of conduct: they requested religious exemptions from United's vaccine mandate, participated in United's accommodation process, and were all put on unpaid leave. Thus, a determination as to Ms. Kincannon's claim would necessarily resolve the claims of other putative class members. *See Braidwood*, 70 F.4th at 934 n.39. The Title VII Unpaid Leave Subclass therefore satisfies typicality.

However, the proposed Rule 23(b)(2) Class does not. The varied harms within the class do not lend themselves to any "typical" claim, and none of the named Plaintiffs' experiences are typical of the entire class. Some were put on unpaid leave, some were subject to the masking-and-testing protocol, and others decided to get vaccinated. Thus, there is no single plaintiff whose claim the Court could resolve that would in turn resolve the claims of all others. *See id.* Similarly, the Masking and

**APPX25**

Testing Subclass does not meet the typicality requirement. Since masking and testing alone is insufficient to establish an adverse employment action, individualized inquiry is necessary to determine the nature of the harm suffered. There are no typical claims.

Thus, the Court concludes that the proposed Title VII Unpaid Leave Subclass satisfies the typicality requirement because the class representative's claims are typical of the class members' claims, arise from the same course of conduct, and are based on the same legal theories. However, the Rule 23(b)(2) Class and the Rule 23(b)(3) Masking-and-Testing Subclass do not satisfy typicality.

### D. Adequacy of Representation

The final Rule 23(a) prerequisite requirement for certification demands that a plaintiff show "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). "Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (citing *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)). "[T]he adequacy requirement mandates an inquiry into (1) the zeal and competence of the representatives' counsel and (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Berger*, 257 F.3d at 479 (cleaned up) (citing *Horton v. Goose Creek Indep. Sch. Dist.,* 690 F.2d 470, 484 (5th Cir. 1982)).

Here, Ms. Kincannon has demonstrated a willingness and ability to take an active role in controlling the litigation since its inception. She has participated in hearings and mediation, provided written discovery, and sat for depositions. *See* ECF No. 238 at 31. The class representative does not have conflicts of interest with other members of the class. Likewise, Plaintiffs are represented by competent counsel with extensive experience in complex litigation and class actions. *See id.* Indeed, United does not dispute that the class representatives and their counsel satisfy this requirement. *See* ECF No. 246 at 14 ("Rule 23(a) requires proof of numerosity, commonality, typicality, and adequacy of

**APPX26**

representation. In this case, Plaintiffs stumble over two of those four elements: commonality and typicality." (citation omitted)). Accordingly, Rule 23(a)'s adequacy-of-representation requirement is satisfied.

*    *    *

In sum, the Court concludes that the Rule 23(b)(2) Class and the Rule 23(b)(3) Masking and Testing Subclass do not satisfy Rule 23(a)'s requirements, but the Title VII Unpaid Leave Subclass does.

## III.    Rule 23(b)(2)-Specific Requirements

Although the Court has already determined the Rule 23(b)(2) Class fails the prerequisite commonality and typicality requirements, the 23(b)(2) Class fails for another, independent reason. Even if the proposed class satisfied Rule 23(a), Rule 23(b)(2) certification would still be inappropriate because Plaintiffs' request for punitive damages is not "incidental" to the requested injunctive relief.

Certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). In other words, Rule 23(b)(2) certification is appropriate when plaintiffs seek injunctive or declaratory relief, not monetary damages. But here, Plaintiffs also seek monetary relief in the form of punitive damages, backpay, and compensatory damages. *See* ECF No. 238 at 40–41.

The underlying premise of the 23(b)(2) class—that its members suffer from a common injury properly addressed by class-wide relief— "begins to break down when the class seeks to recover back pay or other forms of monetary relief to be allocated based on individual injuries." *Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 413 (5th Cir. 1998). Accordingly, certification under Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages." FED. R. CIV. P. 23 (advisory committee notes) (emphasis added) (quoted in *Allison*, 151 F.3d at 411). Instead, monetary relief may be obtained in a Rule 23(b)(2) class action

only if "the predominant relief sought is injunctive or declaratory." *Allison*, 151 F.3d at 411.

The Fifth Circuit has held that "monetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Allison*, 151 F.3d at 415 (emphasis added). In defining incidental damages, the Fifth Circuit explained:

> Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established. That is, the recovery of incidental damages should typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief. Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances. Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Id.* Under this framework, the Court concludes that money damages are not incidental to the equitable relief sought by Plaintiffs.

The reasoning in *Allison* is instructive on this point. The court in *Allison* had "little trouble affirming the district court's finding that the plaintiffs' claims for compensatory and punitive damages are not sufficiently incidental" to the injunctive relief sought. *Id.* at 416. In *Allison*, the court began by addressing the plaintiffs' claims for compensatory damages, explaining: "[t]he very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy." *Id.* at 417. Thus, the court held that "compensatory damages under Title VII and 42 U.S.C. § 1981 are not incidental to class-wide injunctive or declaratory relief for discrimination." *Id.*

**APPX28**

But Plaintiffs say they do not seek backpay and compensatory damages for the proposed Rule 23(b)(2) Class. Rather, "they seek certification of those claims under (b)(3)," apparently referring to the proposed (b)(3) subclasses. ECF No. 256 at 17. Plaintiffs do, however, seek punitive damages for the proposed (b)(2) class. *See* ECF No. 238 at 37 ("[T]he intangible harm Plaintiffs suffered from this coercive choice warrants a two-pronged remedy: (1) an injunction prohibiting United from engaging in this conduct again; and (2) a class-wide award of incidental (here, punitive) damages . . . ."). Thus, the Court must determine whether Plaintiffs' request for punitive damages is incidental to the injunctive relief sought.

In *Allison,* "the court assumed—with reservations—that punitive damages could be awarded on a classwide basis without individualized proof of injury, but emphasized that such damages would be limited to claims that an entire class or subclass was subjected to the same discriminatory act or series of acts." *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 377 (S.D. Tex. 2006) (Rosenthal, J.) (citing *Allison*, 151 F.3d at 417). Even assuming that punitive damages could be awarded on a class-wide basis, the court in *Allison* held that such an award was not appropriate in the case at hand because the plaintiffs did not allege that "each plaintiff was affected by these policies and practices in the same way." *See Allison*, 151 F.3d at 417. Thus, when plaintiffs ask a court to certify both equitable and punitive damages claims under Rule 23(b)(2), two questions emerge. *See Colindres*, 235 F.R.D. at 377. First, can punitive damages be assessed without proof of liability to individual class members? *See id.* Second, was each plaintiff affected by the challenged policy in the same way? *See id.*

As to the first question, *Allison*'s reasoning against a class-wide award of punitive damages applies here. The court explained that punitive damages in the Title VII context "must be reasonably related to the reprehensibility of the defendant's conduct and to the compensatory damages awarded to the plaintiffs," and thus "necessarily turn on the recovery of compensatory damages." *Allison*, 151 F.3d at 417–18. "[B]eing dependent on non-incidental compensatory damages, punitive damages are also non-incidental—requiring proof of how

**APPX29**

discrimination was inflicted on each plaintiff, introducing new and substantial legal and factual issues, and not being capable of computation by reference to objective standards." *Id.* at 418.

Plaintiffs here seek punitive damages for their 23(b)(2) Class, but they acknowledge that compensatory damages are non-incidental and require individualized inquiries not appropriate for (b)(2) certification. *See* ECF No. 256 at 17 ("Plaintiffs do not seek certification of their claims for backpay and compensatory damages under (b)(2), they seek certification of those claims under (b)(3), where claims for individualized damages are appropriate."). Like in *Allison*, because punitive damages must be related to the non-incidental compensatory damages awarded, punitive damages are likewise non-incidental here.[4]

As to the second question, even assuming punitive damages could be awarded on a class-wide basis in this case, Plaintiffs do not allege that "each plaintiff [in the 23(b)(2) Class] was affected by these policies and practices in the same way." *See* ECF No. 238 at 29 ("It is of no moment that some Plaintiffs did not experience United's discrimination in exactly the same way."). Mr. Burk, for example, decided to get vaccinated. Ms. Kincannon, on the other hand, was put on unpaid leave. Other class members took different jobs, and most were never actually put on unpaid leave. Thus, Plaintiffs do not—and cannot—contend that each 23(b)(2) Class member was affected by United's vaccine mandate and unpaid leave policy in the same way. Therefore, the Court finds that punitive damages are not incidental to the injunctive relief sought, rendering (b)(2) certification improper.

---

[4]The Court notes that Plaintiffs, in a footnote, propose that "[i]f the Court disagrees" on this point, "it should instead adopt a hybrid approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief." ECF No. 238 at 37 n.29 (quotations omitted). But "[t]he Court [in *Allison*] specifically rejected the possibility of a 'hybrid' class with injunctive relief under Rule 23(b)(2) and damages relief under Rule 23(b)(3)." *See Colindres*, 235 F.R.D. at 370 (quoting *Allison*, 151 F.3d at 419).

**APPX30**

## IV.    Rule 23(b)(3)-Specific Requirements

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). As explained below, the Court concludes that the proposed Unpaid Leave Subclass satisfies both predominance and superiority, but the Masking-and-Testing Subclass does not.

### A. Predominance

Factual predominance requires that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 253 (5th Cir. 2020). As with commonality and typicality, "the risk of voluminous and individualized extrinsic proof defeating predominance runs particularly high where a defendant raises substantial affirmative defenses." *Id.* at 256. The predominance requirement "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case," and is a "far more demanding" hurdle than Rule 23(a)'s commonality requirement. *Prantil v. Arkema Inc.*, 986 F.3d 570, 576–77 (5th Cir. 2021). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where *the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.*" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up) (emphasis added). As long as individual questions will not overwhelm common ones, individualized questions will not rule out certification. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

Here, United argues that Plaintiffs' 23(b)(3) subclasses fail to satisfy predominance due to (1) individualized liability issues and (2) individualized damages issues. United devotes one page of its brief to the individualized liability issues that may preclude predominance. *See* ECF No. 246 at 38. To fully address potential predominance issues, the Court draws on United's commonality concerns under Rule 23(a). *See*

31

**APPX31**

*Prantil*, 986 F.3d at 579 (explaining that courts must "respond to the defendants' legitimate protests of individualized issues that could preclude class treatment"). The Court will first discuss the elements of the Unpaid Leave Subclass's Title VII claims and their bearing on the predominance inquiry. Then, the Court will discuss United's concerns that damages cannot be calculated without individual inquiry.

 1. <u>Liability Issues</u>

Once again, the elements of Plaintiffs' Title VII claims are: (1) the employee had a sincere religious belief, (2) the belief conflicted with a requirement of employment, (3) the employer was informed of the belief, and (4) the employee suffered an adverse employment action for failing to comply with the conflicting requirement. *See Davis*, 765 F.3d at 485. If they satisfy that showing, the burden shifts to United to demonstrate either (1) that it reasonably accommodated the employee, or (2) that it was unable to do so without undue hardship. *See id.* These questions of law are common across the Unpaid Leave Subclass.

Here, two elements of the prima facie case will clearly be satisfied using the same evidence: the class members' beliefs conflicted with United's vaccine mandate and United was informed of their beliefs. Both elements can be demonstrated class-wide based on evidence that the class members cleared United's hurdles for requesting a religious accommodation. In so doing, the class members informed United of their belief and made a prima facie showing that the belief conflicted with United's vaccine mandate.

But United's Response raises four individual-liability issues: (1) the sincerity of Plaintiffs' beliefs, (2) the reasonableness of the accommodation, (3) whether Plaintiffs suffered an adverse action, and (4) whether United would incur undue hardship in providing an alternative accommodation. Although the Court addressed each issue in its commonality analysis, the Court will now address the reasons common questions predominate with respect to each issue.

*First,* the words and actions of the unpaid leave class members evince a sincerely held religious belief such that Plaintiffs can make a prima facie showing with the same evidence. Each class member necessarily

**APPX32**

(1) articulated a religious reason for not getting vaccinated, (2) submitted a third-party letter attesting to the sincerity of their religious beliefs, (3) chose to accept unpaid leave instead of get vaccinated, and (4) opted into the class. *See supra,* Part II(B)(2)(c). These words and actions are sufficient to carry the class members' light burden of demonstrating sincerity. *See U.S. Navy SEALs 1-26*, 594 F. Supp. 3d at 780. And because these words and actions are common to each class member, the same evidence will suffice for each member to make a prima facie showing on sincerity. Specifically, the class members can satisfy their burden by demonstrating that United's accommodation process required these words and actions, that they complied with that process, and that they were granted an accommodation as a result. Thus, common questions predominate with respect to the sincerity of the class members' religious beliefs.

*Second*, the reasonableness of the unpaid leave accommodation is a common question. All class members in the Unpaid Leave Subclass received the same accommodation—unpaid leave—and the reasonableness of that accommodation will not depend on individual inquiries. United argues the unpaid leave accommodation was not the same across the class for four reasons: (1) employees who qualified for medical leave could use paid sick leave, (2) employees who had pre-scheduled vacations during the unpaid leave period could be paid for that time, (3) some employees may have still been able to pay their bills even though they lost a paycheck, and (4) all employees had the opportunity to apply for a non-customer-facing job. *See* ECF No. 246 at 21–23. None persuade.

For the first and second points, the ability of some employees to offset the financial burden of unpaid leave using sick days or vacation days has no bearing on the reasonableness of the accommodation. Employees stopped receiving their paycheck once they ran out of vacation days, and that policy was common to the class. These considerations relate solely to damages. United's third point is even less persuasive, as the reasonableness of United's accommodation does not depend on whether an employee earned other income from investments, received financial support from family, or had "another breadwinner in the family." *Id.* at

**APPX33**

23. The accommodation was the same across the class, and its reasonableness can be determined class-wide.

United also argues that reasonableness varied because employees had the opportunity to apply for (but no guarantee of receiving) another job at United. *Id.* at 23. Not so. All employees in the Unpaid Leave Subclass received the same accommodation—unpaid leave. And the reasonableness of that accommodation is a question common to the class. To the extent United allowed employees to apply for another job, that fact may indeed be relevant in determining the reasonableness of the accommodation. Some employees applied for but did not get offered another job, some did not apply at all, and others may have received an alternative job offer but decided not to take it. In this instance, a factfinder need not speculate about jobs an employee may have received. The reasonableness inquiry turns on whether the unpaid leave accommodation was reasonable, in light of the fact that qualified employees had the option of applying for other jobs. This accommodation was the same across the class, and thus, the issue may be determined based on generalized, class-wide proof.

*Third*, no individualized inquiry is necessary to determine whether the class members suffered an adverse employment action. All employees were subject to the same adverse action—they were put on indefinite unpaid leave. Accordingly, evidence that the class was put on unpaid leave—a prerequisite for membership in the class itself—will suffice for each class member to make a prima facie showing that they suffered an adverse employment action.

*Fourth*, common questions predominate over individual ones with respect to United's undue hardship defense. United put unvaccinated customer-facing employees on unpaid leave, and the question of whether it would have incurred undue hardship in offering a different accommodation is an issue that is susceptible to generalized, class-wide proof. Plaintiffs can present testimony about "the costs of employees taking tests themselves and providing results," and any state laws that may be implicated in such a policy. And the parties can present testimony "from employees within various work groups" explaining

**APPX34**

whether "the alternative accommodations Plaintiffs proposed would have been feasible." ECF No. 256 at 12.

For these reasons, the proposed Rule 23(b)(3) Unpaid Leave Subclass satisfies the predominance requirement. Common questions of law and fact concerning the sincerity of religious beliefs, the reasonableness of the unpaid leave accommodation, the occurrence of adverse employment actions, and the applicability of the undue hardship defense predominate over any individualized issues. Thus, the Court finds that the Title VII Unpaid Leave Subclass meets predominance under Rule 23(b)(3). However, for the reasons stated in the Court's commonality analysis, the Masking-and-Testing Subclass and the ADA claims in the Unpaid Leave Subclass require individualized inquiry such that common questions do not predominate. The Masking-and-Testing Subclass didn't suffer the same adverse action because masking and testing is insufficient by itself. And for the ADA claims, individualized inquiry is necessary to determine whether each Plaintiff has a qualifying disability under the ADA. Thus, the Masking-and-Testing Subclass members and the Unpaid Leave Subclass's ADA members cannot satisfy their prima facie showing using the same evidence or generalized, class-wide proof. The Court now turns to damages.

### 2. Damages Issues

United argues that individualized damages issues preclude predominance. "Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a class-wide basis.'" *Cruson*, 954 F.3d at 258 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). The issue of damages will defeat predominance "where the calculation of damages is not susceptible to a mathematical or formulaic calculation." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003). Having considered the damages model proposed by Plaintiffs, the Court concludes that the calculation of damages is easily susceptible to mathematical calculation for employees who were put on unpaid leave.

Plaintiffs propose a damages model that begins by averaging each employee's past earnings to determine an "average wage rate" for calculating backpay during the unpaid leave period. "It is well-established in the Fifth Circuit that the trier of fact may rely on a lost income stream calculation that is based on an average wage rate, particularly if the plaintiff has an inconsistent work history." *Nelson v. Cooper T. Smith Stevedoring Co.*, No. CIV.A. 12-2890, 2013 WL 4591362, at *1 (E.D. La. Aug. 28, 2013); *see also In re Parker Drilling Offshore USA LLC*, 323 F. App'x 330, 335 (5th Cir. 2009) (explaining that lost wages at the time of injury can be calculated by "estimating the earnings from past data when earnings data was inconsistent"); *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1050 (5th Cir. 1990) (affirming district court's determination that lost wages can be calculated based on Plaintiff's "earnings record over the previous two years"). This "average wage rate" calculation is appropriate here because, as United points out, flight crew employees do not have salaries. Their compensation is highly variable, driven by personal preferences, available flights, and other factors. *See* ECF No. 246. Courts in this circuit routinely confront this issue in calculating backpay, and the average wage rate calculation is an easily calculable and well-established method of calculating backpay in such instances.

United, however, argues that "the use of averages would, by definition, undercompensate some putative class members" and overcompensate others. *See* ECF No. 246 at 40. This argument misconstrues Plaintiffs' damages model. As applied to the Unpaid Leave Subclass, Plaintiffs seek to take the average wage rate for each individual class member, multiplied by the time each employee was on unpaid leave, to determine lost wages during the unpaid leave period. This ensures a fair and accurate measure of damages, tailored to each employee's earnings history. Though this necessarily involves some individual inquiry—insofar as it hinges on an employee's past earnings—the determination is conducive to mathematical calculation.

After calculating backpay, Plaintiffs propose a method of calculating punitive damages on a class-wide basis "by allowing the factfinder to determine an appropriate ratio of punitive to economic damages, which

**APPX36**

can then be mechanically applied to all members of this subclass." *See* ECF No. 238 at 41. Such an approach is consistent with prior cases in this circuit, in which a ratio or multiplier has been used to assess punitive damages. *See Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 323 (5th Cir. 1998) (rejecting a challenge to the use of a multiplier in determining punitive damages); *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 282 (E.D. Tex. 1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986) (holding a punitive award shall be made "by determining the entire amount of compensatory damages awarded by trial or settlement" and determining the "ratio thereto of each individual's award").

United argues that punitive damages are not capable of class-wide proof because they require "proof of how discrimination was inflicted on each plaintiff." *See* ECF No. 246 at 42. United says this means punitive damages must be assessed on an individual basis. United is correct as applied Plaintiffs' proposed 23(b)(2) Class, which is comprised of employees who allegedly suffered a wide array of harms. But as applied to the Unpaid Leave Subclass's Title VII claims, all class members suffered the same harm—they were put on unpaid leave. Thus, punitive damages will not vary with individual circumstances, except in relation to the economic loss incurred by an individual class member. If a jury finds that United acted "with malice or with reckless indifference," *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981a(b)(1)), it can award a uniform amount of punitive damages as a remedy. Such an award will be proportional to the economic loss incurred by individual class members as a result of the unpaid leave policy. For that reason, United's uniform treatment of the Unpaid Leave Subclass makes the punitive damages calculation capable of mathematical calculation (by determining an appropriate multiplier of punitive damages to compensatory damages) should the factfinder determine such an award is appropriate. *See Cimino*, 151 F.3d at 323.

Accordingly, Plaintiffs have demonstrated that their proposed damages model for backpay and punitive damages is capable of measurement on a class-wide basis using established, mathematical methods. The use of an average wage rate to calculate backpay is well-supported by precedent and is particularly suited to situations where

**APPX37**

employees' earnings are highly variable. Additionally, the proposed method for determining punitive damages by applying a ratio to economic damages is consistent with prior rulings in this circuit and ensures a uniform approach across the class. Therefore, the Court finds that Plaintiffs' damages model satisfies the Rule 23(b)(3) predominance inquiry with respect to damages.

## B. Superiority

"Superiority" requires that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). This involves a "fact-specific analysis and will vary depending on the circumstances of any given case," *Madison v. Chalmette Refin., LLC*, 637 F.3d 551, 555 (5th Cir. 2011). Rule 23(b)(3) contemplates four considerations in determining the superiority of a class action vis-à-vis other available methods: (1) the class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action.

As an initial matter, it is clear that one of the primary rationales for class treatment—judicial efficiency—is well-served here. The unpaid leave class consists of hundreds of employees who requested religious accommodations and were put on indefinite unpaid leave. For the reasons discussed above, all class members suffered the same injury, received the same accommodation, and share common questions of law and fact. Requiring courts to manage hundreds of lawsuits addressing the same questions and evidence makes little sense. Thus, in this case, certification "would promote judicial economy and avoid the wasteful, duplicative litigation which would inevitably result if these cases were tried individually." *Mullen*, 186 F.3d at 627.

United argues that the practical difficulties of managing the proposed classes undermine the judicial efficiency of class-wide resolution. If the Court were to certify Plaintiffs' proposed Rule 23(b)(2)

and both Rule 23(b)(3) subclasses, the Court would agree. The difficulty in managing a Rule 23(b)(2) class consisting of over 6,000 class members with varying injuries, accommodations, and causes of action would wholly undermine the superiority of the class action mechanism. Likewise, a 23(b)(3) class consisting of employees who were required to mask and test, each of whom suffered different harms and adverse employment actions—harassment, difficulty breathing, lonely lunches, excessive Lysol spraying—would be unmanageable and inefficient. The class members could not make out a prima facie case of religious discrimination without individualized inquiry. Contrast this with a class consisting of employees who sought religious accommodations and were put on indefinite unpaid leave. All class members suffered the same injury, were granted the same accommodation, and assert the same cause of action. The same evidence will support each class members' prima facie case of religious discrimination, and the reasonableness of the accommodation and undue hardship defense can be determined class-wide. Thus, United's arguments do not persuade when it comes to the unpaid leave Title VII class.

"The greater the number of individual issues, the less likely superiority can be established." *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). Naturally, the inverse is also true—claims with few or no individual issues lend themselves to class-wide resolution. In the preceding section, the Court discussed the common evidence relevant to each element of Plaintiffs' prima facie case. Furthermore, United's reasonableness and undue hardship defenses apply class-wide. The reasonableness of the unpaid leave accommodation does not hinge on individuals' financial circumstances or the jobs for which they were qualified—thus, such a defense will succeed or fail as to each class member on the same evidence. Similarly, United's undue hardship defense is capable of class-wide proof.

Further, the fact that many class members still work at United weighs in favor of superiority because "those potential class members still employed by [United] might be unwilling to sue individually or join a suit for fear of retaliation at their job." *Mullen*, 186 F.3d at 625. Indeed, another principal function of the class action mechanism is the

"vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). This includes cases where plaintiffs "are vulnerable to reprisals by the defendant due to a continuing economic relationship, such as employment." 2 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4.65 (6th ed. 2023). Many class members are still employed by United, and thus may be dissuaded from suing individually for fear of jeopardizing their employment. This is, of course, in addition to the burden and potential expense of bringing individual claims against United, who has far more time and resources to litigate such matters.

Lastly, at this point in the litigation, the Court is painfully familiar with the law, facts, and applicable defenses in this case, making this Court a desirable forum for litigating this action. Ultimately, having considered the available methods for fairly and efficiently adjudicating the controversy, the Court concludes that a class of employees who requested religious accommodations and were put on unpaid leave satisfies Rule 23(b)(3)'s superiority requirement.

\*    \*    \*

In sum, the Court finds that the Plaintiffs' Motion for Class Certification should be **GRANTED in part** and **DENIED in part**. The proposed Rule 23(b)(2) Class and the Rule 23(b)(3) Masking-and-Testing Subclass do not satisfy the commonality and typicality requirements under Rule 23(a), nor do they meet the criteria under Rule 23(b). The different injuries suffered and the individual questions raised within these proposed classes preclude class-wide resolution of their claims.

However, the Court concludes that the Rule 23(b)(3) Unpaid Leave Subclass's Title VII claims meet the criteria for certification. This subclass includes all employees United deemed customer-facing who received an accommodation due to a sincerely held religious beliefs and who were put on unpaid leave. The claims of these employees satisfy the commonality and typicality requirements under Rule 23(a), share common legal and factual questions that predominate over any individual issues, and a class action is the superior method for

**APPX40**

adjudicating their claims efficiently and fairly. Accordingly, the Court appoints Plaintiffs' counsel as class counsel with Ms. Kincannon as the named plaintiff and modifies Plaintiffs' proposed Unpaid Leave Subclass to encompass only the Title VII claims. The Court thus certifies a class consisting of <u>all employees United deemed customer-facing who received an accommodation due to a sincerely held religious beliefs and who were put on unpaid leave</u>. *See Braidwood*, 70 F.4th at 934. (explaining the court "may modify the classes to fit the requirements better and should not dismiss an action purely because the proposed class definition is too broad").

## V.    Plaintiffs' Motion for Reconsideration

Finally, Plaintiffs' Motion for Reconsideration is also before the Court. ECF No. 241. Plaintiffs ask the Court to reconsider its prior order granting in part United Motion to Dismiss. Having reviewed the Motion, the Court finds that the Motion for Reconsideration should be and is hereby **DENIED**.

## CONCLUSION

For the reasons stated above, the Court finds that the Plaintiffs' Motion for Class Certification (ECF No. 238) should be **GRANTED in part** and **DENIED in part**. Additionally, the Court finds that the Motion for Reconsideration (ECF No. 241) should be and is hereby **DENIED**.

**SO ORDERED** on this **21st day of June 2024**.

Mark T. Pittman
UNITED STATED DISTRICT JUDGE

41

**APPX41**